ROBERT S. KHUZAMI
Deputy United States Attorney for the
Southern District of New York
    *Attorney for the United States,*
    *Acting Under Authority Conferred*
    *by 28 U.S.C. § 515*
By:   ANTHONY J. SUN
     NATASHA W. TELEANU
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2810/2528
Fax: (212) 637-2786
anthony.sun@usdoj.gov
natasha.teleanu@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **COMPLAINT** |
| vs. | No. 19 Civ. 2490 |
| COLUMBIA GAS TRANSMISSION LLC, HENRY SCHEIN, INC. and UNION CARBIDE CORPORATION, | |
| Defendants. | |

Plaintiff United States of America, by its attorney, Robert S. Khuzami, Deputy United

States Attorney for the Southern District of New York, acting under authority conferred by 28

U.S.C. § 515, on behalf of the Administrator of the United States Environmental Protection

Agency ("EPA"), alleges as follows:

## NATURE OF THE ACTION

1.     Defendants Columbia Gas Transmission LLC ("Columbia"), Henry Schein, Inc.

("Schein"), and Union Carbide Corporation ("UCC") (collectively, "Defendants") arranged for

the disposal or treatment of scrap mercury by Port Refinery Co., Inc. ("Port Refinery"), a mercury refinery business operated out of a residence at what has been designated by EPA as the Port Refinery Superfund Site in the Village of Rye Brook, Westchester County, New York (the "Site").

2.      Port Refinery's treatment and processing of the scrap mercury sent by Defendants and other parties led to extensive releases of mercury, a hazardous substance, requiring two separate clean-up actions ("removals") by EPA under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9604.

3.      The United States brings this action to recover costs incurred in the second removal and for a declaratory judgment pursuant to Sections 107 and 113(g) of CERCLA, 42 U.S.C. §§ 9607 & 9613(g)(2).

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 42 U.S.C. §§ 9607(a) & 9613(b) and 28 U.S.C. §§ 1331 & 1345.

5.      Venue is proper in the Southern District of New York pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. §§ 1391(b) & (c) because the releases or threatened releases of hazardous substances giving rise to the United States' claims occurred in this District and because the Site is located in this District.

## THE PARTIES

6.      Plaintiff is the United States of America, acting on behalf of EPA.

7.      Defendant Columbia is a Delaware limited liability company with offices at 700 Louisiana Street, Suite 700, Houston, Texas. Columbia owns and operates natural gas pipelines

and natural gas storage systems. During the 1970s, Columbia used mercury in its operations within instruments that measured the flow and pressure of natural gas within its pipelines. As part of Columbia's operations, mercury contained within instruments was disposed of as scrap mercury when the instrument no longer functioned, was replaced, or was phased out as part of a company-wide effort to discontinue the use of mercury.

8.     Defendant Schein is a Delaware corporation with offices at 135 Duryea Road, Melville, New York. Schein is a supplies distributor to the healthcare industry, specifically to office-based practitioners (medical doctors, dentists, and veterinarians), and a prescription drug wholesaler. Among other things, Schein is a distributor of dental supplies, including amalgams containing mercury. During the 1980s, Schein resold mercury it purchased from Port Refinery as its own Private Label liquid mercury. Schein's operations resulted in the generation of scrap mercury.

9.     Defendant UCC is a New York Corporation with offices at 7501 State Highway 185 North, Seadrift, Texas. UCC is a chemical and polymers manufacturing company. During the 1970s, UCC contracted for the demolition and disposal of a water pump station and an acetylene generation unit, both of which contained scrap mercury. This process generated waste and rubbish to be disposed, including scrap mercury.

**THE CERCLA STATUTORY SCHEME**

10.     In 1980, CERCLA was enacted to provide a comprehensive governmental mechanism for abating releases and threatened releases of hazardous substances and for funding

the costs of such abatement and related enforcement activities, which are known as "response

actions." 42 U.S.C. §§ 9601(25), 9604(a).

11.    Section 104(a)(1) of CERCLA provides, in pertinent part:

> Whenever (A) any hazardous substance is released or there is a substantial
> threat of such a release into the environment, or (B) there is a release or
> substantial threat of release into the environment of any pollutant or
> contaminant which may present an imminent and substantial danger to the
> public health or welfare, the President is authorized to act, consistent with
> the national contingency plan, to remove or arrange for the removal of, and
> provide for remedial action relating to such hazardous substance, pollutant,
> or contaminant at any time (including its removal from any contaminated
> natural resource), or take any other response measure consistent with the
> national contingency plan which the President deems necessary to protect
> the public health or welfare or the environment. . . .

42 U.S.C. § 9604(a)(1).

12.    For purposes of enforcing CERCLA, the Administrator of EPA is the President's

delegate, as provided in operative Executive Orders, and, within certain limits, the Regional

Administrator and Superfund and Division Director of Region 2 of EPA have been re-delegated

this authority.

13.    The term "release" is defined in Section 101(22) of CERCLA to include:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging,
> injecting, escaping, leaching, dumping or disposing into the environment
> (including the abandonment or discarding of barrels, containers, and other
> closed receptacles containing any hazardous substance or pollutant or
> contaminant). . . .

42 U.S.C. § 9601(22).

14.    The term "hazardous substance," as defined by Section 101(14) of CERCLA,

42 U.S.C. § 9601(14), includes hazardous wastes and other chemicals and substances designated

under specified environmental statutes and regulations. Mercury is among the hazardous

substances listed in the regulations promulgated under CERCLA at 40 C.F.R. § 302.4, App. A,

and is a hazardous substance within the meaning of Section 101(14) of CERCLA.

15.     Under Sections 104(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9604(a) & 9607(a),

EPA, upon determining that there is a release or a substantial threat of release of a hazardous

substance that warrants response actions, may undertake the response actions itself and later seek

reimbursement from the responsible parties by way of a cost recovery action.

16.     Section 107(a) of CERCLA specifically provides, in pertinent part, that:

> (3) any person who by contract, agreement or otherwise arranged for
> disposal or treatment, or arranged with a transporter for transport for
> disposal or treatment, of hazardous substances owned or possessed by such
> person, by any other party or entity, at any facility or incineration vessel
> owned or operated by another party or entity and containing such hazardous
> substances . . . shall be liable for—
>
> (A) all costs of removal or remedial action incurred by the United States
> Government . . . not inconsistent with the national contingency plan; . . .

42 U.S.C. § 9607(a).

17.     The term "person," as used in CERCLA, includes, *inter alia*, "an individual, firm,

corporation, association, partnership [or] . . . commercial entity . . . ." 42 U.S.C. § 9601(21).

18.     The term "facility," as used in CERCLA, is defined broadly to mean "any site or

area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise

come to be located . . . ." 42 U.S.C. § 9601(9).

19.     Section 113(g) of CERCLA provides that, after an initial cost recovery action, the

United States may initiate "[a] subsequent action or actions [under Section 107 of CERCLA] for

further response costs at the . . . facility." 42 U.S.C. § 9613(g).

## STATEMENT OF FACTS

I.    The Site

20.    The Site is located in a residential neighborhood in the Village of Rye Brook,

Westchester County, New York, and includes the parcel of land located at 55 Hillandale Road in

Rye Brook (the "Source Property"), the buildings and other structures located or formerly

located on the Source Property, and the properties adjacent to the Source Property where

mercury came to be located (the "Affected Properties"). At all times relevant to this complaint,

the Source Property consisted of approximately 0.7 acres of land and, until they were removed

by EPA, a two-story residence, a swimming pool with a poolside cabana structure, a shed, and a

two-story garage with a small basement.

21.    Until approximately 2000, the Source Property was owned by Edmund and/or

Norma Barbera.

22.    Until approximately 1991, the Source Property was the site of Port Refinery, a

then-existing New York corporation that was owned and operated by Edmund Barbera.

23.    At all times relevant to this complaint, the Source Property was bordered by

private residences on its south, east, and west sides. A private, multi-family complex borders the

Source Property on its north side.

24.    A high school is located approximately ¼ mile from the Source Property. A

hospital and numerous commercial enterprises and residences are also located within

approximately one mile of the Source Property.

II.    Mercury Contamination at the Site

25.    For approximately twenty years prior to 1991, Port Refinery was engaged in the

business of mercury reclaiming, refining, and other processing.

6

26.    Port Refinery advertised itself in metal industry trade publications as a processor of mercury "scrap" and "residue."

27.    Used or scrap mercury and scrap materials containing mercury (collectively, "scrap mercury") have impurities that render them useless for common commercial and industrial purposes. To attain the levels of purity needed for commercial and industrial uses of mercury, scrap mercury must be processed to remove impurities. The processing of scrap mercury to render it suitable for commercial or industrial use results in a waste by-product that contains mercury, which must be disposed of. The processing of scrap mercury described above also changes scrap mercury's physical and chemical character by removing impurities.

28.    Each of the Defendants arranged for the sale and the transport of scrap mercury for treatment and disposal that came to be located at the Site either directly or through a third-party scrap dealer.

29.    In July 1978, Columbia arranged for the sale and the transport of approximately 274 pounds of used mercury to be sold to a third-party scrap dealer and ultimately transported to Port Refinery for treatment or disposal.

30.    Columbia sold the used mercury at a price more than 68% below the lowest market rate for commercial grade mercury.

31.    In December 1983, Schein arranged for the sale and the transport of approximately 23 pounds of scrap mercury to Port Refinery for treatment or disposal.

32.    Schein sold the scrap mercury to Port Refinery at a price below the lowest market rate for commercial grade mercury.

33.    In September 1971, October 1971, June 1972, September 1972, November 1976, and September 1983, UCC arranged for a total of approximately 601 pounds of scrap mercury to

be sold to a third-party scrap dealer that ultimately transported the material to Port Refinery for treatment or disposal.

34.     UCC sold the scrap mercury at prices between 30% and 55% below the contemporaneous lowest market rates for commercial grade mercury.

III.    The First Removal

35.     As a result of Port Refinery's business operations relating to reclaiming, refining, and processing scrap mercury, including the disposal of the waste those processes created, the structures at the Source Property as well as soil, surface water, and groundwater at the Site became extensively contaminated with mercury.

36.     To address the release or threatened release of mercury, EPA conducted a first removal between 1991 and 1996 (the "First Removal").

37.     Over the course of the First Removal, EPA discovered (i) mercury vapor inside the garage on the Source Property, (ii) mercury in and on the structures, including the walls, the floors, the window sills, and the ceiling beams, on the Source Property, and (iii) mercury in the soils and sediments of both the Source Property and the Affected Properties.

38.     As part of the First Removal, EPA undertook response activities that included (i) fencing the Source Property to restrict public access to it, (ii) soil sampling, (iii) removing and disposing of contaminated soils and other materials from the Source Property and the Affected Properties, (iv) demolishing the contaminated garage building and the contaminated pool cabana structure, and (v) restoring the properties from which contaminated soils and other materials had been removed. The United States incurred over $6.4 million of response costs during the course of the First Removal.

IV.     The 1996 CERCLA Action

39.     On November 14, 1996, the United States commenced a civil action in this Court, seeking recovery of the costs that the United States had incurred during the course of the First Removal. The United States sought recovery of its costs from the owners/operators of the Site and from the parties who arranged for the disposal or treatment of hazardous substances at the Site.

40.     From approximately June 1997 to approximately May 2002, the United States entered into six separate consent decrees in connection with the First Removal.

41.     Schein was party to the lawsuit and resolved its liability for the First Removal in a third partial consent decree, entered on March 29, 1999. This third partial consent decree contains a covenant not to sue by the United States as to response costs incurred through August 30, 1998, only, and does not prevent the United States from suing to recover any response costs it incurred after that date.

42.     Columbia and UCC were parties to the lawsuit and resolved their liability for the First Removal in a fourth partial consent decree, entered on June 9, 2000. This fourth partial consent decree contains a covenant not to sue by the United States as to response costs incurred through November 29, 1999, only, and does not prevent the United States from suing to recover any response costs it incurred after that date.

V.      The Second Removal

43.     In approximately April 2004, EPA received a report of mercury in or around a paved area near the Source Property. Prior to receiving this report, EPA was not aware of any remaining mercury at the Site.

44.     Following its receipt of the April 2004 report, EPA initiated a second removal

(the "Second Removal") at the Site, which included soil sampling and excavation and disposal of mercury-contaminated soil. EPA's soil sampling results indicated that the mercury contamination detected in April 2004 had originated from the Source Property.

45.     Subsequently, EPA discovered two sub-surface vaults on the Source Property that contained numerous empty bottles, cylinders, and other laboratory containers. These containers had been used to transport and handle mercury.

46.     During the course of the Second Removal, EPA conducted numerous activities, including, among other things (i) excavating and disposing of more than 9,300 tons of mercury-contaminated soil from the Site; (ii) installing air and water filtration systems for residences on the Source Property and a nearby Affected Property; (iii) removing the two sub-surface vaults located on the Source Property containing mercury-contaminated containers; (iv) removing contaminated pond sediments; (v) demolishing the residence on the Source Property; (vi) cleaning up the underground pipes at the Source Property; (vii) compensating the current residents of the Source Property for the demolition of their residence; (viii) backfilling the excavated land; (ix) restoration work; and (x) air and water sampling and analysis.

47.     The Second Removal was conducted in response to releases or threatened releases of mercury, a CERCLA hazardous substance at the Site, and constitutes a response action within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

48.     The United States' costs of the Second Removal were not inconsistent with the National Contingency Plan (the "NCP"), 40 C.F.R. Part 300.

49.     The Second Removal cost the United States more than $7 million.

50.     The United States has subsequently sued twelve other responsible parties for costs incurred in the Second Removal, *see United States v. Jacob Goldberg & Son, Inc., et al.*, No. 10

10

Civ. 3237 (CS); *United States v. Monroe Iron & Metal Co., Inc., et al.*, No. 17 Civ. 6217 (VB);

*United States v. Steel of W. Va., Inc.*, No. 18 Civ. 1661 (KMK).

## <u>FIRST CAUSE OF ACTION</u>

51.     The United States repeats the allegations in paragraphs 1 through 50.

52.     The Site is a facility within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

53.     Columbia is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

54.     Schein is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

55.     UCC is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

56.     There have been releases of hazardous substances within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and threatened releases of hazardous substances, at or from the Site.

57.     Subsequent to November 29, 1999, the United States incurred response costs within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), while responding to the releases and threatened releases of a hazardous substance at the Site.

58.     Columbia, Schein, and UCC are jointly and severally liable to the United States for any response costs incurred in connection with the Second Removal because, under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), they arranged for the disposal or treatment at the Site of a hazardous substance they owned or possessed.

## **SECOND CAUSE OF ACTION**

59.     The United States repeats the allegations in paragraphs 1 through 58.

60.     Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the United States is entitled to a declaratory judgment that Defendants are jointly and severally liable to the United States for any future response costs, not inconsistent with the NCP, incurred in connection with the Site.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that the Court:

(i)     Enter judgment against Defendants jointly and severally, and in favor of the United States, for the response costs incurred by the United States in connection with the Second Removal, in an amount to be established at trial;

(ii)     Grant a declaratory judgment in favor of the United States that Defendants are jointly and severally liable for all future response costs to be incurred by the United States in response to the release or threatened release of hazardous substances at the Site; and

(iii)     Order such further relief as the Court may deem just and proper.

Dated: March 20, 2019
          New York, New York

                              ROBERT S. KHUZAMI
                              DEPUTY UNITED STATES ATTORNEY
                              *Attorney for the United States,*
                              *Acting Under Authority Conferred by*
                              *28 U.S.C. § 515*


                         By:  s/ Anthony J. Sun
                              ANTHONY J. SUN
                              NATASHA W. TELEANU
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, NY 10007
                              Telephone: (212) 637-2810/2528
                              Fax: (212) 637-2786
                              anthony.sun@usdoj.gov
                              natasha.teleanu@usdoj.gov


                              THOMAS A. MARIANI, JR.
                              Section Chief
                              Environmental Enforcement Section
                              Environmental and Natural Resources Division
                              U.S. Department of Justice


Of Counsel:

WALTER S. M. SAINSBURY
U.S. Environmental Protection Agency
290 Broadway, 17th Floor
New York, NY 10007
Telephone: (212) 637-3177
sainsbury.walter@epa.gov